IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 4, 2020

**BRANDON LEE CLYMER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-314      Steve R. Dozier, Judge**

_____

**No. M2019-02189-CCA-R3-PC**

_____

The petitioner, Brandon Lee Clymer, appeals the denial of his post-conviction petition arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Brandon Lee Clymer.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.      Trial Proceedings**

The petitioner, Brandon Lee Clymer, was convicted by a Davidson County Criminal Court jury of rape of a child, for which he received a twenty-six-year sentence to be served in confinement. On direct appeal, this Court set forth the relevant facts as follows:[1]

---

[1] Due to the length of the trial court testimony, we have only included those facts relevant to the issues raised on post-conviction and on appeal.

The [petitioner's] conviction relates to the December 2013 digital-vaginal penetration of the then-six-year-old victim. The [petitioner] was a family friend at the time of the offense.

At the trial, the victim testified that her birthdate was July 25, 2007. She said that two years earlier, in 2014, the [petitioner] "digged in" her "pee pee." She identified her pee pee as her private area. She said the incident occurred next to the computer in the kitchen of her aunt's house. She said she had been standing and playing games on the computer. She said that she wore a dress and that the [petitioner] touched her skin. She did not recall how long the incident lasted or how it ended. She said that she told her mother, her aunt, and her uncle what happened. The victim said her mother called the police. The victim did not know if she talked to the police but said she was interviewed by "Ms. Lillie" at the Nashville Children's Alliance. She said that before she came to court, she watched a video recording of her interview.

The video recording of the victim's January 10, 2014 interview was played for the jury. It reflects the following: The victim lived with her mother, aunt, and two cousins. The victim pointed to parts of her body that were "private places," and she identified them on a drawing. She identified them as "nipple," "pee pee," and "butt." She said ["the petitioner"] touched her pee pee more than once on one date. She said the touchings occurred while she used a computer in the kitchen and while she watched "Panda Bears Christmas." She said that he touched her pee pee on her skin and clothes and that he touched her pee pee inside and outside. When asked how it felt when [the petitioner] touched the inside of her pee pee, the victim stated it felt like "nothing." When asked how it felt when he touched the outside of her pee pee, the victim stated, "It feeled [sic] like he wasn't touching me." The victim stated that the incident at the computer occurred first, that [the petitioner] sat in a chair, that he put one of her legs on a chair as she stood, that [the petitioner] did not speak, that she wore a dress and panties, and that he moved her panties and "started digging in" her pee pee. She said it felt like [the petitioner] was not doing anything. When asked what digging meant, the victim stated, "It means you're digging in the dirt looking for stuff." She said he moved his hand from side to side. When asked if she had said [the petitioner's] fingers went inside her, she said, "Mmm hmm," and nodded. When shown a drawing and asked if he put his fingers inside the hole, she said he did not. When shown the drawing and asked if he put his fingers "inside the two parts over here," the victim nodded affirmatively. The victim added that the [petitioner] touched "the line on your pee pee" and was

"swinging that around." She said three people were in the living room and another person was upstairs. The victim said that [the petitioner] stopped when her mother walked in and that her mother did not see anything.

In the recorded statement, the victim said that the second incident occurred as she and [the petitioner] lay on the bed in the room she and her mother shared. The victim said that others were in the living room and that her brother was in the bedroom lying on the bed with [the petitioner] and her. She said [the petitioner] put her under the covers. The victim said, "He did this," and made a motion with her hand, but what she demonstrated is not visible on the recording. She made a motion with her hand a second time, the details of which are not visible on the recording, and the interviewer asked if [the petitioner] stuck his hand in the victim's pants. The victim responded by making a motion, which again is not visible on the recording, and stated, "Just like this." When the interviewer asked if the victim meant the back of her pants, the victim nodded. When asked how this felt, the victim responded with a statement that is unintelligible on the recording. The victim said [the petitioner] did not touch her pee pee and agreed that he touched around the back of her pants. When asked to clarify if she meant he touched around the top part of her pants or her butt, the victim stated he touched her skin at the top part of her pants. She said he did not speak during the incident. The victim stated that [the petitioner] did not do anything to himself and that he remained clothed during the incidents. She said [the petitioner's] actions made her feel "weird." The victim stated that no one other than [the petitioner] had ever touched her inappropriately. The victim stated that after [the petitioner] left, she told her mother what happened and that her mother told other family members. The victim first said the incidents occurred after Christmas but then said she thought it was "about to be Christmas."

The victim testified that she remembered everything and that her recorded statement was true. She agreed that the statement had been given two years earlier and that she had been six years old when the incident occurred. She agreed the [petitioner] touched her twice: once when she was at the computer and once when she was upstairs watching "Panda Christmas." She said the incident at the computer occurred first. When asked to reenact how she had demonstrated in the interview that the [petitioner] had touched her, she said she did not remember. She agreed that she said in the interview that the [petitioner] touched the outside and the inside of her pee pee. When asked to demonstrate where the [petitioner's]

finger had been relative to "outside" and "inside," she stated that she could not remember.

The victim testified that she understood the importance of telling the truth and that she was truthful in her testimony. She identified the [petitioner] in the courtroom. The victim said that the [petitioner] was her uncle's friend, that she and her mother lived with her aunt and uncle for one to two months, and that the [petitioner] visited at their house.

During cross-examination, defense counsel drew a diagram of the home in which the incidents occurred based upon the victim's descriptions. She agreed that her mother, two grandmothers, an aunt, an uncle, her brother, and two cousins had been at the house on the date of the incidents. The victim said the [petitioner] visiting the house was normal.

The victim agreed that the only time the [petitioner] touched her pee pee was when she stood at the computer. She agreed that the adults, other than the [petitioner], watched a movie in the living room and that she was not home alone with the [petitioner] when this occurred. She said that she was never home alone with the [petitioner] that day and that she had never been home alone with him. She agreed that the [petitioner] touched her skin but that his finger did not go inside the hole on her pee pee. She agreed that her mother walked in the kitchen and that her mother did not see what the [petitioner] had done to her. She said that the [petitioner] touched her a second time in the kitchen and that she told her mother after the second time.

The victim agreed that the [petitioner] did not touch her pee pee in the bedroom. She agreed that her brother was in the bedroom with the [petitioner] and her when the [petitioner] touched her on her back. She said he did not touch her between her legs.

The victim agreed that she knew it was important to tell her mother what happened. She said at first that she did not think her mother had talked to her about what to do if an adult touched her inappropriately, but she later conceded her mother might have. The victim said that after she told her mother, her mother told her aunt and uncle about what happened. The victim said her aunt talked to her about what happened. She agreed that she heard her whole family discussing the matter and that it was upsetting. The victim said her mother called the police quickly. She did not remember talking to Officer Earle or other officers. She remembered talking to Ms. Lillie, the interviewer on the video recording, but she did not remember talking to Ms.

- 4 -

Tamika on the day of the recorded interview or at her school. She agreed that she talked to Ms. Lillie shortly after the incidents and that the incidents occurred when "it was about to be Christmas."

. . .

The victim's mother testified that she, the victim, and the victim's brother moved to Tennessee in 2013. The victim's mother said they moved into the home of her sister, her sister's husband, and her two nieces.

The victim's mother identified the [petitioner]. She said the [petitioner] and her sister's husband had been best friends in 2013. She described the [petitioner] as being "like a family member."

. . .

She said [that on December 21, 2013,] the adults socialized, ate pizza, and watched a movie in the living room, and the children played, ate pizza, and watched a movie upstairs. She said the [petitioner] and her sister's husband went upstairs to take pizza to the children, that her sister's husband returned first, and that the [petitioner] did not return for another fifteen to twenty minutes. She said the [petitioner] was the only adult upstairs during this time. She said that after the [petitioner] returned, the adults socialized and that the victim came downstairs to use a computer in the kitchen. The victim's mother stated that as she went outside to smoke, the victim asked to speak to her. The victim's mother said that she could tell the matter was serious by the look on the victim's face, that the victim told her the [petitioner] had touched the victim's pee pee and felt the victim's butt, and that the victim's mother got her sister and had the victim repeat her statement to the victim's mother's sister. The victim's mother said that her sister got her sister's husband, that they had the victim repeat her account to the sister's husband, and that the sister's husband asked the [petitioner] to leave without giving the [petitioner] an explanation. The victim's mother said the [petitioner] left quietly, which was unusual because he was normally argumentative and confrontational. She said that she called the police and that they arrived after the [petitioner's] departure.

. . .

The victim's mother did not recall if she told Detective Mike Bennett that the [petitioner] had been upstairs alone with the children for about fifteen

- 5 -

minutes. She said she met with Ms. Drennan once and did not recall if she told Ms. Drennan that the [petitioner] had been alone with the children. The victim's mother said she saw the victim and the [petitioner] in the kitchen together on December 21, 2013. She said she saw the victim straddling the [petitioner's] knee when the victim and the [petitioner] were in the kitchen at the computer and did not recall if she reported this to a detective or a DCS employee. The victim's mother said she never had a real opportunity to talk to anyone and said that when she did speak with a detective, they merely asked her questions. She said she thought she had done what she was supposed to do. She agreed that she did not see the [petitioner] touch the victim's vagina.

The victim's uncle testified that on December 21, 2013, he lived with his wife and his children. He said that the victim's mother, the victim, and the victim's brother were living with them temporarily and that his mother-in-law and his wife's grandmother were visiting on that date. The victim's uncle did not recall if his brother was at the home on December 21. The victim's uncle identified the [petitioner], whom he said was "basically a brother to us." The victim's uncle said his sister and the [petitioner's] cousin were married. The victim's uncle said that he and the [petitioner] would "hang out sometimes for days on end" and that on December 21, they were very close. The victim's uncle said that the [petitioner] and everyone in the victim's uncle's household were close and that they loved and trusted the [petitioner].

The victim's uncle testified that on December 21, 2013, his wife and the victim's mother left for most of the day, returning around 3:00 to 4:00 p.m. He said he and the [petitioner] "hung out" and played a video game. The victim's uncle said the [petitioner] was at the house most of the day, and the victim's uncle did not recall if the [petitioner] had stayed overnight the previous evening. The victim's uncle said that at one point, the [petitioner] cared for the children when the victim's uncle went to a store. The victim's uncle said that during the early evening, the [petitioner] had been in the kitchen using the victim's uncle's computer. The victim's uncle said that after his wife and the victim's mother returned, "We were mostly hanging out watching a movie," and that the [petitioner] was in the kitchen with the victim "hanging out on the computer." The victim's uncle said the [petitioner] seemed attached to the children, especially the victim, that evening, which was unusual behavior for the [petitioner]. The victim's uncle said that he and the [petitioner] went upstairs together to take pizza to the children. The victim's uncle noted that at another time, the [petitioner] went

upstairs to check on the children and lay in bed and watched a movie with them. The victim's uncle stated that at one point, he was upstairs and saw the [petitioner] lying in bed with the victim and one of the victim's uncle's daughters. The victim's uncle said that he asked the [petitioner] when the [petitioner] was going to come downstairs to socialize with the adults and that the [petitioner] responded, "I'll be down there in a little while." The victim's uncle said the [petitioner] returned downstairs at some point.

The victim's uncle testified that at one point on the evening of December 21, 2013, his wife asked him to come outside. The victim's uncle said the victim's mother told him that the [petitioner] had touched the victim inappropriately. The victim's uncle said that he went inside, that he heard the bathroom sink running, that he saw the [petitioner] coming out of a bathroom drying the [petitioner's] hands on the [petitioner's] pants, and that the victim's uncle brought the victim outside. The victim's uncle said that he asked the victim what happened and that she told him. The victim's uncle said he returned to the living room and asked the [petitioner] to leave because they had family business to which they needed to attend. The victim's uncle said the [petitioner] stated, "[T]hat's okay, I will see you later." The victim's uncle said the [petitioner's] reaction was unusual because the [petitioner] could be "nosey." The victim's uncle said that he did not tell the [petitioner] about the sexual abuse allegations and that the [petitioner] did not inquire. The victim's uncle said that he had not heard from the [petitioner] since December 21, 2013, and that this was unusual because they had been close. The victim's uncle identified a photograph of his home, which he agreed was a duplex with his living area being about 1120 square feet.

. . .

Lillie Kennedy, a forensic interviewer and an employee of Nashville Children's Alliance, testified that she interviewed the victim.

. . .

A portion of the victim's recorded interview was played. Ms. Kennedy testified with regard to a drawing seen in the recording on which the victim circled body parts and that Ms. Kennedy labeled them with the names the victim used for the parts. Ms. Kennedy agreed that when she discussed the drawing with the victim, she asked the victim if the [petitioner's] finger "went inside her hole" and that the victim said, "no." Ms. Kennedy thought that the victim had said the [petitioner's] finger went

inside "the line" and that Ms. Kennedy had asked if the victim meant inside the "two parts." Ms. Kennedy said that Ms. Kennedy had referred to a line on the drawing representing the vaginal lips.

Metro Nashville Police Detective Elizabeth Mills testified that she was assigned to the [petitioner's] case, although two other detectives had handled the case before her. She said that she and Detective Nathan Smith located the [petitioner] at a relative's house and interviewed the [petitioner]. An audio recording of the August 1, 2014 interview was played for the jury. In the interview, the [petitioner] stated the following: He was aware the victim's mother had called the police because the victim said the [petitioner] touched the victim. He first heard about the allegations in January of an unspecified year. Someone left a handwritten message at the [petitioner's] grandfather's house, but the [petitioner] did not call the number in the message. The [petitioner] knew the victim's mother from going to his "cousin-in-law's house and hanging out." The [petitioner] said he had been left alone a few times with the victim and the cousin-in-law's children. He said he was not a sexual predator and that he had been upset and thought the allegations were offensive. He recalled an occasion on which he was at his cousin-in-law's house and had been drinking and watching a movie, although he could not recall the date. He thought that at some point, he had been upstairs on the bed watching a movie with the victim and another child. He said that his cousin-in-law asked him to leave, that he heard arguments in the back of the house, that arguments were not unusual in the house, and that he did not "think anything of it." He said he had no indication why he was asked to leave. He said that about one month later, he mentioned to "Josh" that the police had looked for the [petitioner] at his place of employment. He then learned about the victim's allegations. The [petitioner] did not know why the victim would make the allegations and said that if he had touched the victim's vaginal area, it had to have been accidental. He said, "Obviously something happened that was misconstrued." He said the victim sometimes straddled his knee and that when he was tired of having her sit there but she did not want to move, he would "unclench her." He said the victim was a "huggy, touchy child" who liked to be around people. He said that he might have picked up the victim and touched her between her legs but that he was merely playing with the victim. He said he had spent the night at the house where the victim lived but that he had never dressed any of the children who lived there.

Detective Mills testified that the [petitioner] had been nervous and defensive during the interview. She said that she did not collect rape kit

evidence due to the passage of time between the offense and her taking over the case. She noted, as well, that at the time of the offense, "touch DNA" evidence was not widely known and used. She agreed that the [petitioner] never admitted he had intentionally touched the victim.

. . .

After receiving the evidence, the jury found the [petitioner] guilty of rape of a child.

*State v. Brandon Lee Clymer*, M2016-01124-CCA-R3-CD, 2017 WL 5197292 (Tenn. Crim. App. Nov. 9, 2017), *perm. app. denied* (Tenn. Mar. 14, 2018).

This Court affirmed the trial court's judgment and the petitioner's twenty-six-year sentence.

## II.    Post-Conviction Proceedings

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, arguing trial counsel was ineffective for failing to: provide counsel concerning the petitioner's right to testify, provide counsel during plea negotiations, obtain an expert witness, effectively cross-examine the State's witnesses, prepare visual aids, compel the election of offenses, file a motion to suppress, present a meaningful defense, and object to prior bad act evidence. The petitioner and trial counsel testified at the post-conviction hearing.

The petitioner testified that he was represented by two attorneys with the Metro Nashville Public Defenders Office. Trial counsel was the lead attorney and did the majority of the work on the petitioner's case. The petitioner met with trial counsel "several times, maybe three" during the pendency of the case. Though trial counsel and petitioner met several times, the petitioner did not feel he had "much of a relationship" with trial counsel.

The petitioner explained that he did not know much about the trial process but trusted trial counsel's judgment in preparing the case for trial. The petitioner insisted he was innocent and told trial counsel he would not accept a plea deal. The State presented a plea offer for aggravated sexual battery with a sentence ranging from eight to twelve years. When trial counsel informed the petitioner of the State's offer, the petitioner refused, and the petitioner's case proceeded to trial.

- 9 -

Prior to trial, the petitioner did not know anything about trial counsel's defense strategy. Trial counsel informed the petitioner of his right to testify and explained that it was the petitioner's decision as to whether or not he testified in his defense. The petitioner also complained because trial counsel did not prepare visual aids of the crime scene, nor did she prepare visuals to demonstrate the size of the victim and the petitioner.

Before being formally charged in the instant matter, the petitioner was interviewed at his home by two Metro Nashville Police detectives. During the interview, the petitioner made statements to the detectives and felt he was not free to leave while the detectives were in his home. The petitioner did not attempt to leave the interview. The State used the petitioner's interview at trial. Trial counsel successfully filed a motion to have parts of the interview redacted. Trial counsel did not, however, raise an issue regarding whether the petitioner should have been advised of his *Miranda*[2] rights prior to the interview.

Trial counsel did not call any witnesses on the petitioner's behalf. The petitioner testified that trial counsel should have hired a psychosexual expert to show he was not a child predator. He further asserted that a psychologist was needed to evaluate the victim's credibility. The petitioner also testified that trial counsel did not effectively cross-examine witnesses. He claimed trial counsel did not inquire into inconsistencies in the witnesses' testimonies and should have asked more questions during cross-examination.

At trial, the State presented testimony from the victim's uncle about the petitioner and victim watching a movie together in bed on the day the alleged offense occurred. The petitioner was not convicted of anything relating to this testimony. Trial counsel did not object to the admission of this testimony.

Prior to the date of the allegations in question, the petitioner and the victim's family were friends. The petitioner spent a great deal of time at the family's home, slept on their couch, and played video games in their living room. The petitioner believed the victim's family did not want him "around" the home because he was "a bum" and was "over there too much." Though he expressed this belief to trial counsel, trial counsel did not use the information as part of the petitioner's defense. The petitioner admitted, however, that the victim's family never confronted him about any of these alleged issues.

On cross-examination, the petitioner testified he was represented by trial counsel and another public defender on trial counsel's team. The petitioner admitted trial counsel explained the discovery process and trial procedure. The petitioner received a discovery packet, but he did not review it until after trial. Trial counsel also reviewed the State's evidence with the petitioner, showed the petitioner the recordings of his interview with

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1996).

detectives, and discussed the possible punishment he was facing if convicted. The petitioner tried to assist with the preparation of his case and understood the charge against him.

The petitioner affirmed that trial counsel discussed the petitioner's right to testify. This discussion, however, did not occur until either the day before or the day of trial. While claiming trial counsel should have hired a psychological expert to evaluate the witnesses, the victim, and himself, the petitioner stated that he did not know of any potential experts, nor did he have the names of any experts that could have been called during trial. The defense strategy was that the petitioner was innocent and that the victim was mistaken about what happened on the day of the alleged offense.

Regarding the potential *Miranda* issue, the petitioner testified he was arrested "months" after his interview with detectives. He listened to the recording of the interview before the post-conviction hearing but did not remember the specific details of the interview. The recording was not played at the post-conviction hearing nor was it entered into evidence.

On re-direct examination, the petitioner testified trial counsel told him that he could either accept the State's plea offer or go to trial, and trial counsel advised him to take the plea deal.

Trial counsel testified she had been a public defender for the Metro Nashville Public Defender's Office for ten years. She had tried over twenty jury trials, one of which was a rape of a child case. From 2014 to 2018, trial counsel was the supervising attorney in Division I of Davidson County Criminal Court. Initially, trial counsel assigned the petitioner's case to a member of her team. However, when the attorney asked trial counsel for assistance, trial counsel became second chair on the petitioner's case.

Trial counsel explained the petitioner was "unsure" about the legal process and was deferential to the advice of his attorneys. Though he was unsure of the process, the petitioner participated in preparing his defense, understood the charge against him, and knew the factual underpinnings of his case. Because the petitioner maintained his innocence, trial counsel's defense strategy was to discredit the victim. Trial counsel discussed this defense with the petitioner and explained that discrediting a six-year-old victim would be a challenge.

Prior to trial, trial counsel discussed the State's plea offer with the petitioner. The State's offer was for ten years at thirty percent release eligibility. While trial counsel contemplated countering the State's offer, she ultimately decided not to do so because the petitioner did not give her the authority to do so. Trial counsel explained that the petitioner

- 11 -

always maintained his innocence, and, as a result, she told the petitioner she would never ask him to plead guilty to a crime he did not commit. She also explained the risks of going to trial and the petitioner's potential sentencing exposure. The petitioner refused to take the plea.

In preparing for trial, trial counsel's general practice is to discuss the fundamental aspects of a case with each client. One of those fundamental aspects is the client's right to testify. Trial counsel does not remember her specific discussion with the petitioner regarding his right to testify but stated it is something she discusses with all of her clients prior to trial.

Trial counsel explained she did not move to suppress the interview because the petitioner was not in custody at the time the interview occurred, the petitioner did not have an intellectual disability that would prompt Fifth Amendment protections, and she successfully had portions of the interview redacted. Given the facts surrounding the interview, trial counsel did not believe a *Miranda* violation had occurred. In hindsight, trial counsel explained she might not try the case the same way a second time and may have tried to suppress the statement.

Regarding the use of an expert witness, trial counsel testified it did not occur to her to have a psychosexual examination on the petitioner or a psychological evaluation of the victim. Trial counsel stated the use of a psychosexual expert was an interesting idea, but such testimony was likely inadmissible at trial. She further testified that the use of such an expert would open the door to damaging evidence about a six-year-old's tendency to lie or turn into a battle of the experts regarding the typical behavior of child sex abuse victims.

Trial counsel explained that she made an intentional decision not to request an election of offenses because nothing about the petitioner's case indicated the need for an election. Trial counsel's trial strategy was to show that the victim was not credible and that her story was inconsistent. As a result, trial counsel chose to focus on the inconsistencies in the victim's testimony at trial, not that there were multiple instances of abuse.

During the cross-examination of the victim, trial counsel had the victim draw a diagram showing the victim and the petitioner's location within the home at the time of the alleged offense. Trial counsel did not, however, produce a three-dimensional layout of the home or introduce life-size figures of the parties into evidence at trial. She explained that, while she did not send an investigator to the victim's home, she attempted to find photographs of the home to get a visual of the home's layout. Trial counsel also discussed the layout of the home with the petitioner.

Trial counsel explained that neither she nor her co-counsel thought to object to the victim's uncle's testimony about the petitioner and victim lying in bed together before the alleged abuse occurred. Trial counsel stated that not objecting was not a strategic decision. Rather, "it just didn't occur to us" to object. She explained that she generally conducts a prior bad act analysis of evidence before trial, and assumed she did so in preparing the petitioner's case.

Regarding the frequency with which the petitioner met with defense counsel, trial counsel testified to the jail visitation records. The records showed the petitioner met with a public defender once before posting bail and several times post-verdict before the petitioner's sentencing hearing. The State entered these records into evidence.

On cross-examination, trial counsel testified that she discussed the right to testify with the petitioner, though she does not have a specific memory of the conversation. Trial counsel believed it was her obligation to provide the petitioner with legal advice about the likely outcome of any legal proceeding. She provided the petitioner with the facts of the case, but did not tell him that he "must" do a certain thing in regard to putting on his defense at trial. Further, trial counsel did not provide the petitioner with her personal beliefs when discussing the State's plea offer. The State then submitted the trial transcript as an exhibit to the hearing.

After reviewing the proof, the post-conviction court denied relief. This timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to: provide counsel during plea negotiations, provide counsel concerning the petitioner's right to testify, call an expert witness, cross-examine witnesses, file a motion to suppress, present visual aids, object to prior bad act evidence, and present a meaningful defense. The State contends trial counsel was not ineffective, and that petitioner failed to present proof to establish any of his claims. Following our review of the record, briefs, and applicable law, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff*

*v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

### A. Failure to Provide Counsel During Plea Negotiations

The petitioner argues trial counsel was ineffective for failing to provide adequate advice regarding the State's plea offer. The State contends trial counsel was not ineffective because the petitioner made it known from the outset of his case that he would not accept a plea deal. We agree with the State.

At the post-conviction hearing, the petitioner claimed he was innocent and explained that he maintained his innocence throughout the duration of his case. He testified that, from the first meeting with defense counsel, he was adamantly opposed to accepting a plea deal. Trial counsel testified that she discussed the State's plea offer with the petitioner, and he chose to maintain his innocence. She also wanted to counter the State's offer, but the petitioner refused.

To determine whether a petitioner is entitled to relief for ineffective assistance of counsel during plea negotiations, the petitioner has the burden of showing by a reasonable probability that, but for counsel's deficient representation, (1) the petitioner would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed. *Nesbit v. State*, 452 S.W.3d 779, 800-01 (Tenn. 2014). Here, the petitioner failed to establish he would have accepted an offer from the State. In fact, the petitioner testified he would not have accepted any offer because he was innocent. The petitioner also failed to establish that the trial court would have accepted the terms of the offer. As a result, the petitioner has failed to meet his burden of proof. The petitioner is not entitled to relief.

### B. Failure to Provide Counsel Concerning the Petitioner's Right to Testify

The petitioner argues trial counsel was ineffective for failing to adequately advise him of his right to testify. The State contends trial counsel adequately advised the petitioner. Upon our review of the record, we affirm the judgment of the post-conviction court.

At the post-conviction hearing, the petitioner testified that trial counsel explained he could testify in his own defense but left the decision up to the petitioner. Trial counsel stated that she met with the petitioner multiple times to discuss trial strategy. She explained it was her general practice to advise clients concerning their fundamental trial rights, one of which is the right to testify. Additionally, the post-conviction court made the following findings:

> Although the [p]etitioner claims that [trial counsel] should have discussed the decision [to testify] with [the petitioner] in more detail, [the petitioner]

- 15 -

also acknowledged that [trial counsel] generally advised him of his right to testify. Further, while [trial counsel] testified she could not remember particular details of her conversations with the [p]etitioner about whether or not he should testify, she testified that she almost certainly would have talked with him about that right because that is something she always does with her clients. Thus, in light of the testimony, the [c]ourt finds that [trial counsel] did generally advise the [p]etitioner of his right to testify.

The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Trial counsel advised the petitioner of his right to testify, and the petitioner voluntarily decided to waive his right. Thus, the petitioner has not shown deficient performance on the part of trial counsel. The petitioner is not entitled to relief on this issue.

## C. Failure to Call Witnesses

The petitioner argues trial counsel was ineffective for failing to obtain expert and rebuttal witnesses to testify on his behalf. The State argues the petitioner did not produce any such witnesses at the post-conviction hearing, and therefore, has failed to establish prejudice. Upon our review of the record, we affirm the judgment of the post-conviction court.

At the post-conviction hearing, trial counsel testified that the petitioner's case did not present the need for a psychosexual expert or an evaluation of the victim's credibility. Trial counsel explained that expert testimony regarding the credibility of the victim would have been damaging to the petitioner's case and likely inadmissible. Though the petitioner testified trial counsel should have hired an expert to conduct a psychosexual examination regarding his propensity to commit sexual assault and had the victim's credibility psychologically evaluated, the petitioner did not present any experts during the post-conviction hearing. "To succeed on a claim for ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. Because the petitioner failed to call an expert witness or present rebuttal witnesses at the post-conviction hearing, he cannot meet his burden. As such, the petitioner is not entitled to relief on this issue.

## D. Failure to File Motion to Suppress

The petitioner argues trial counsel was ineffective for failing to file a motion to suppress his pre-arrest interview with law enforcement. The petitioner contends the interview amounted to a custodial interrogation conducted in the absence of *Miranda* warnings and, as such, was not admissible at trial. He further argues that had the interview been suppressed, the jury would not have found him guilty. The State contends trial counsel was not ineffective as there was not a valid basis for trial counsel to suppress the petitioner's entire interview. Upon our review, we affirm the findings of the post-conviction court.

To prove prejudice on a claim that trial counsel was ineffective for failing to file a motion to suppress, a petitioner must show "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed* (citing *Vaughn v. State*, 202 S.W.3d 103, 120 (Tenn. 2006)). Therefore, "[i]f a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present . . . the [evidence supporting the claim] at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong*." Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415 at *4 (Tenn. Crim. App. Nov. 8, 2013), *perm. app. denied* (Tenn. Mar. 17, 2014).

*Miranda* warnings are required when a suspect is in police custody and subjected to questioning or its functional equivalent. *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Tennessee Supreme Court has found that a suspect is in custody when, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself "deprived of freedom of movement to a degree associated with a formal arrest." *Id*. (citing *State v. Anderson*, 937 S.W.3d 851, 855 (Tenn. 1996).

Here, the petitioner testified that the interview occurred in his home. He claimed that, while he felt he could not leave the interview, he did not try to end communications with the detectives. Trial counsel testified that she filed a motion to redact several portions of the interview. Trial counsel explained that it "may not have occurred" to her to file a motion to suppress the entire interview because the petitioner did not have an intellectual disability and was not in custody at the time of the interview. Trial counsel admitted that in hindsight she would have objected to all potentially damaging evidence and may have tried the case differently a second time.

Additionally, the post-conviction court reached the following conclusion:

Although the [p]etitioner testified in the instant hearing that he felt some pressure to speak to the police, the [c]ourt agrees with [trial counsel's] assessment that there was no substantial basis for a suppression motion to be filed. The [p]etitioner was not in custody at the time of the interview such that he had to be advised of his *Miranda* rights. Further, there has been no indication that the questioning of the police was so overbearing or coercive as to render his confession involuntary. The [c]ourt cannot find that [trial counsel] was deficient for failing to file a motion that would not have had any merit.

The petitioner failed to provide proof that the detectives' words or conduct amounted to the equivalent of a custodial arrest. The petitioner further failed to provide evidence to show that a reasonable person would not have felt free to end the interview. As a result, the petitioner has not provided proof to show that he was in custody at the time of the interview in question.

Trial counsel's decision regarding the motion to suppress is justified because the petitioner was not in custody at the time that he spoke with detectives. Had trial counsel filed a motion to suppress, the motion would have been without merit. The petitioner provided no proof to support his assertion that a motion to suppress the interview would have been granted. Nor has he shown that trial counsel's decision regarding the admission of the interview effected the outcome of the proceedings. Accordingly, we conclude trial counsel's representation did not fall below an objective standard of reasonableness, and the petitioner is not entitled to relief on this issue.

### E. Failure to Effectively Cross-Examine Witnesses

Next, the petitioner claims trial counsel was ineffective for failing to adequately cross-examine witnesses. The State contends this argument is without merit because the petitioner failed to produce any witnesses at the post-conviction hearing. Upon review of the record, we agree with the State.

The petitioner testified he did not "believe [trial counsel] crossed the witnesses very well." He claimed trial counsel should have questioned the victim's family about their negative feelings toward him. When a petitioner contends trial counsel failed to cross-examine witnesses in support of his defense, these witnesses should be presented by the petitioner at the post-conviction hearing. *See Johnson v. State*, 145 S.W.3d 97, 120 (Tenn. Crim. App. 2004); *see also Black*, 794 S.W.2d at 757-58. Here, the petitioner failed to call members of the victim's family at the post-conviction hearing. As a result, the petitioner failed to meet his burden, and is not entitled to relief.

### F. Failure to Prepare Visual Aid

The petitioner asserts trial counsel was ineffective for failing to prepare a visual aid of the crime scene. The State contends the petitioner failed to present proof that a visual aid would have benefited the petitioner at trial. Upon our review, we agree with the findings of the post-conviction court.

The post-conviction court made the following findings:

[Trial counsel] developed and introduced a diagram showing the location of the chair, the victim, and the [p]etitioner during her cross-examination of the victim. Further, [trial counsel] referenced a diagram during her closing argument in an attempt to disprove the victim's testimony. The [c]ourt also heard no proof as to how a more complex, three-dimensional rendering would have benefitted the [p]etitioner. Thus, the [c]ourt finds that [trial counsel] was not deficient in her representation, and that the [p]etitioner has failed to establish any prejudice from this alleged deficiency.

Trial counsel testified that she and her team investigated the layout of the victim's home, and that she discussed the layout with the petitioner. During cross-examination of the victim at trial, trial counsel had the victim draw a diagram of the home and used this diagram during closing arguments to show the inconsistencies with the victim's testimony. The post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Moreover, the petitioner failed to present a three-dimensional model of the home that could have been used at trial, and failed to show how a different visual aid would have benefitted his case or changed the outcome of the trial. *See Black*, 794 S.W.2d at 757-58; *Strickland*, 466 U.S. at 687. As a result, the petitioner is not entitled to relief on this issue.

### G. Failure to Object to Prior Bad Act Evidence

The petitioner asserts trial counsel was ineffective for failing to object to the victim's uncle's testimony that the petitioner and victim were in bed together on the day of the charged offense. The State argues the testimony did not amount to a prior bad act and was admissible. Upon our review, we agree with the findings of the post-conviction court.

Tennessee Rule of Evidence 404(b) provides, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes."

The conditions which must be satisfied before allowing such evidence are:

(1) the court upon request must hold a hearing outside the jury's presence; (2) the court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Here, the victim's uncle testified he found the petitioner, victim, and a third child watching a movie in bed. The victim's uncle did not testify to observing any inappropriate touching during that time. The State did not use this testimony at trial as character or propensity evidence; rather, the testimony appears to have been offered for the sole purpose of providing the jury with a complete version of the events of that day. As a result, there was no reason for trial counsel to object to the State's use of such evidence.

Additionally, trial counsel testified that she had not considered objecting to the victim's uncle's testimony because it was admissible. In its order denying relief, the post-conviction court found the following:

> The [c]ourt respectfully disagrees with the contention that [trial counsel] should have objected to such evidence. The incident in question did not involve additional inappropriate touching, but involved the [p]etitioner, the victim, and a third child watching a movie together in the bedroom. To the extent that the [p]etitioner had any contact with the victim during that time, there was no indication or implication it was inappropriate. [Trial counsel] testified that she did not consider that incident to be a bad act that would be governed by Tennessee Rule of Evidence 404(b), and the [c]ourt agrees with this assessment.

The post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Moreover, "[t]he fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim for ineffective assistance." *Cooper*, 847 S.W.2d at 528. The petitioner failed to provide proof during the post-conviction hearing to show the State's use of the evidence fell under Tenn. R. Evid. 404(b). The petitioner further failed to provide proof that trial counsel's decision regarding the uncle's testimony was objectively unreasonable or that he was prejudiced in any way by trial counsel's decision. *Strickland*, 466 U.S. at 687. As a result, the petitioner is not entitled to relief.

- 20 -

**H. Failure to Present a Defense**

The petitioner argues trial counsel did not present a meaningful defense at trial, which left him with little chance of obtaining a desirable outcome. The State argues trial counsel was effective and did everything the petitioner asked of her when presenting the petitioner's defense. Upon our review of the record, we agree with the State.

At the post-conviction hearing, trial counsel explained the theory of defense was to attack the victim's credibility by focusing on the victim's inconsistent statements. Trial counsel did not pursue other defense theories because the petitioner maintained his innocence throughout the duration of his case. Trial counsel's testimony indicates that she presented a meaningful and challenging defense while also honoring the petitioner's claim of innocence. Trial counsel's defense theory was reasonable and is entitled to deference on collateral review. *Strickland*, 466 U.S. at 690-91. The fact that a trial strategy failed or was detrimental to the defense, does not, alone, support a claim for ineffective assistance of counsel. *Cooper*, 847 S.W.2d at 528. Deference is given to sound tactical decisions made after adequate preparation for the case. *Id*. As such, the petitioner is not entitled to relief on this issue.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE